Mark E. Ellis, SBN 127159, Email: mellis@ellislawgrp.com
Omid Shabani, SBN 267447, Email: oshabani@ellislawgrp.com
Timothy S. Lam, SBN 319831, Email: tlam@ellislawgrp.com
ELLIS LAW GROUP, LLP
1425 River Park Drive, Suite 400
Sacramento, CA  95815
Tel: (916) 283-8820
Fax: (916) 283-8821

Attorneys for Plaintiff ALLISON SKIDMORE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ALLISON SKIDMORE,<br><br>Plaintiff,<br><br>v.<br><br>THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, GREGORY S. GILBERT, MADELEINE FAIRBAIRN, FLORA LU, AND S. RAVI RAJAN,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **Violation of Plaintiff's First Amendment Rights Pursuant to 42 U.S.C. § 1983;**<br><br>2. **Violation of Plaintiff's Fourteenth Amendment Rights Pursuant to 42 U.S.C. § 1983;**<br><br>3. **Intrusion on Plaintiff's Right to Privacy [False Light]**<br><br>**And DEMAND FOR JURY TRIAL** |

Plaintiff Allison Skidmore, by and through her counsel, alleges against the Regents of the University of California, and its employees, Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan (collectively, the "Defendants"), as follows:

## **INTRODUCTION**

1.      Ms. Skidmore brings this action for, among other things, damages, as well as declaratory and injunctive relief, and to vindicate her rights under the First and Fourteenth Amendments to the

United States Constitution, and 42 U.S.C. § 1983.

2.      Defendants Gilbert, Fairbairn, Lu, and Rajan, all of whom are, or were part of the faculty of the Environmental Studies Department at the University of California, Santa Cruz (hereinafter, "UCSC"), violated Ms. Skidmore's First Amendment rights, while working in their official capacities as employees of defendant the Regents of the University of California ("the Regents"), by imposing *de facto* discipline on Ms. Skidmore for constitutionally protected speech made on a personal and private Facebook page, outside of school hours, and in a conversation not otherwise affiliated with UCSC.

3.      Defendants Gilbert, Fairbairn, Lu, and Rajan infringed Ms. Skidmore's Constitutional rights and damaged her reputation by releasing a series of statements condemning Ms. Skidmore for her private Facebook posts and falsely characterizing her as, or insinuating that she is, a racist, xenophobe, and genocidal toward the Chinese people.

4.      Defendants Gilbert, Fairbairn, Lu, and Rajan also violated the due process guarantees of the Fourteenth Amendment by imposing, under the guise of being faculty members in the Environmental Studies Department ("ESD") at UCSC, *de facto* discipline on Ms. Skidmore, and by threatening to deprive, if not, depriving Ms. Skidmore of her vested property interests in her earning a Ph.D. as well as future career opportunities, without providing Ms. Skidmore fair notice and an opportunity to be heard before characterizing her as racist, xenophobic, and genocidal toward the Chinese people, and repeatedly publishing that false characterization.

5.      The UCSC ESD faculty, including, but not limited to, defendants Gilbert, Fairbairn, Lu, and Rajan, have also infringed on Ms. Skidmore's right to privacy by deliberately commenting on Ms. Skidmore's protected speech, taking it out of context and by doing so, placing both her and her speech in a false light to large audiences, knowing their comments would be disseminated to these audiences out of context, in a false light, and unrelated to her participation in the doctoral program of which she is a candidate.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as the claims asserted herein present federal questions under 42 U.S.C. § 1983 and pertain to violations of Ms. Skidmore's constitutional rights protected by the First and Fourteenth Amendments to the United State Constitution.

7.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 because the Defendants reside in this judicial district and a substantial part of the acts or omissions giving rise to Ms. Skidmore's claims have occurred in this district.

## PARTIES

8.     Plaintiff ALLISON SKIDMORE is a United States citizen who resides in the States of Montana and California.  Ms. Skidmore is a private citizen.

9.     Defendant THE REGENTS OF THE UNIVERSITY OF CALIFORNIA ("the Regents") is a California corporation organized and existing under and by virtue of the laws of the State of California, with a principal place of business at 1111 Franklin Street, 8th Floor, Oakland, CA 94607. Pursuant to section 9 of the California Constitution, the University of California is a public trust, to be administered by the existing corporation known as "The Regents of the University of California."  Said corporation shall also have all the powers necessary and convenient for the effective administration of its trust, including the power to sue and be sued … and to delegate to its committees or the faculty of the university, or to others, such authority or functions as it may deem wise." (Cal. Const. Art. IX, §§ 9 (a) - (f).)  All of the actions of the officials of the University of California and the Regents described herein took place under color of state law.

10.     Defendant GREGORY S. GILBERT ("Gilbert") is the Department Chair of the Environmental Studies Department at the University of California, Santa Cruz.  As the Department Chair, defendant Gilbert is the leader and the administrative head of the ESD.  Among other duties, defendant Gilbert is charged with the duty to recommend appropriate disciplinary action and if desired,

- 3 -

may be assisted in discharge of his duties, by an executive committee chosen in an appropriate manner. Gilbert is sued in his official capacity.

11.     Defendants MADELEINE FAIRBAIRN ("Fairbairn"), FLORA LU ("Lu"), and S. RAVI RAJAN ("Rajan"), are UCSC ESD faculty members.  Defendants FAIRBAIRN, LU, and RAJAN are also members of UCSC ESD's Diversity Committee.  Defendants Fairbairn, Lu, and Rajan are sued in their official capacities.

12.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, the Regents, Gilbert, Fairbairn, Lu, and Rajan, and each of them, were the agents, employees, or representatives of each other, and in doing the things herein alleged, were acting within the course and scope of such agency, employment, or representation, with the permission and consent of each of the other Defendants.  The actions of each Defendant were ratified and approved by each other, or their officers, directors, employees, and/or the agents of each other Defendant.

## **FACTUAL ALLEGATIONS**

13.     Ms. Skidmore is a passionate animal rights activist.  She is a UCSC ESD Ph.D. candidate.  Ms. Skidmore's Ph.D. focus is on the wildlife trafficking of endangered animals, specifically Amur tigers, in the Far East, principally Russia.  Prior to the events described more fully herein, Ms. Skidmore had been advised by her UCSC Ph.D. advisor that she is on track to earn her Ph.D. by June 2021.  As part of her Ph.D. field research, Ms. Skidmore traveled to Russia in the beginning of the 2020 year to investigate the poaching of Amur tigers and their trafficking to China.  During her time in Russia, Ms. Skidmore was exposed to, and observed, daily illegal wildlife animal hunting, killing, and trafficking.

14.     From January 2020 to early March 2020, Ms. Skidmore spent approximately two months in Russia conducting interviews of persons who were aware of, and directly involved in, the poaching, buying, and smuggling of tigers and other animals.

15.     When Ms. Skidmore returned to the United States, one of her Ph.D. advisers, Daniel Press, informed her that because of her research and her academic progress thus far, she was "on track" to complete the Ph.D. program early so as to graduate and obtain her Ph.D. by June 2021.

16.     On March 12, 2020, Mr. Press advised Ms. Skidmore to provide the Ph.D. dissertation committee with an outline of her research findings in Russia and a timeline for completing her Ph.D. thesis by June 2021.

17.     On March 28, 2020, Ms. Skidmore complied with Mr. Press' request and provided the dissertation committee with an outline of her findings and her timeline on completing her thesis to graduate by June 2021.

18.     On or about March 29, 2020 to March 30, 2020, Ms. Skidmore was online and read an Instagram post, dated March 24, 2020, with accompanying pictures.  The post by "P.H." read:

> "Speechless. According to China's state run Xinhua News Agency, they are recommending bear bile injections as a treatment for COVID-19.
>
> In early 2000, I spent time with . . . and I have to say this is the cruelest practise [*sic*] I have ever witnessed, bears in crusher cages year after year, draining them of bile.  I'm so f … angry right now.  They deserve all they get . . . Despite a scientific consensus pointing to China's wildlife trade as the most likely cause of the coronavirus pandemic, the country's Government is currently touting a treatment containing bile milked from bears held in captivity.
>
> Bile is a digestive fluid produced by the liver and stored in the gallbladder.  It is harvested using several techniques, all of which require some degree of invasive surgery.
>
> EIA has learnt [*sic*] that a public list of recommended treatments for coronavirus (aka COVID 19), the country's National Health Commission is promoting injections of a traditional medicine treatment which contains bear bile.  "Tan Re Qing" injections are among the recommended treatments for "severe" and "critical" cases of coronavirus in the COVID 19 Diagnosis and Treatment Plan (7th Trial Version), published on 4 March 2020 by the National health Commission and circulated via State media.
>
> Bear bile is one of the ingredients of "Tan Re Qing," according to the website of a major pharmaceutical manufacturer.
>
> In February, the Chinese Government banned the consumption of most terrestrial

- 5 -

wild animals as food in the wake of coronavirus.  This should be a positive move if implemented effectively and ethically – however, the ban does not cover use of wildlife products in traditional Chinese medicine or as ornamental items.

Traditional medicines containing threatened wildlife parts, such as pangolin scales, leopard bones, saiga horn and the bile of captive-bred bears are still legal in china. #photographersagainstwildlifecrime #earchtreeimages #cutconflictpalmoil #banthesnare."

P.H's post was accompanied by photographs, including this one:



19.      After Ms. Skidmore read P. H's post about the endangered Asiatic black bears as

potential treatment for COVID-19, she became incensed, outraged and sickened; she, herself, in turn

posted (and incorporated P.H.'s post) heated comments regarding this issue on her private Facebook

account, adopting language similar to that written by P.H..

20.     Ms. Skidmore's post was directed to her private Facebook "friends;" it was not intended for the general public, but directed only to those Facebook users confirmed on her page as "friends." Ms. Skidmore posted her comments on Facebook venting her frustration and anger regarding the subject of animal cruelty directed toward the endangered Asiatic black bears.

21.     Ms. Skidmore's Facebook post was in turn, unbeknownst to Ms. Skidmore and without her consent, sent by someone to the UCSC Environmental Studies Department.

22.     On March 31, 2020, while Ms. Skidmore was discussing her research with her Ph.D. advisor, Professor Daniel Press, he raised the topic of her Facebook post.  Ms. Skidmore had not reviewed what had been sent to the faculty.  Apparently her post had also been shared with "NextShark," a self-described "Asian-American" publication which wrote to UCSC and falsely stated that Ms. Skidmore had said "she wished an entire country must be wiped off the planet," which was not what Ms. Skidmore said, and it gave no context to what she actually said and why.

23.     Later, Mr. Press informed Ms. Skidmore that the ESD faculty had met and would release a "response" to Ms. Skidmore's Facebook post.  Ms. Skidmore was not given the Department's response to read, much less to comment upon, before it was published.  Without having a chance to review what had been sent to the faculty, or what the Department was going to post, Ms. Skidmore, acting under duress, emailed an apology to Mr. Press and the ESD faculty.

24.     On April 1, 2020, UCSC's Chief Diversity Officer, Linda Scholz, spoke to Ms. Skidmore about the protected post and to obtain Ms. Skidmore explanation.  After hearing Ms. Skidmore's explanation, Ms. Scholz assured Ms. Skidmore that she would "clear up" the confusion with the Department faculty members.

25.     Ms. Skidmore was not told, and Scholz did not explain or disclose to her that UCSC had actually commenced an investigation for purposes of disciplining her under the loaded internal file name: "Racist, Pro-Genocide Posts from Ph.D. Candidate, Allison Skidmore."  A second investigation

may also have begun by the Chancellor's office, which was also not disclosed to Ms. Skidmore.  By April 1, 2020, the investigator warned: "My read is this would be protected speech under the First Amendment."

26.     Notwithstanding the assurance by Ms. Scholz to Ms. Skidmore, and the uncompleted "secret" investigation, on April 2, 2020, the UCSC ESD issued a "response" regarding Ms. Skidmore's private Facebook post demonstrating that it had already tried and convicted her:

> Dear Environmental Studies community,
>
> A member of our student community recently posted an appalling, hateful, and violent comment on social media. The comment was disturbingly xenophobic. . .
>
> As a faculty, *we are outraged and saddened that a member of our student community holds these views*, and additionally demonstrated profound thoughtlessness and poor judgment in making such abhorrent views public. We denounce the views expressed in this student's comment in the strongest possible terms. Such views are an antithesis to our core values as a department, and to the UCSC Principles of Community.  (Emphasis added.)

The ESD's response conceded Ms. Skidmore's comments:

> . . . were expressed on a private social media account, without any formal UCSC affiliation. . . .

The Department nevertheless demonstrated its intent to *de facto* punish her when it stated as follows:

> . . .[O]ur disciplinary options are circumscribed. . .
>
> [T]he Environmental Studies faculty is committed to creating a department. . . which makes clear that *hate speech* has absolutely *no place in our community* . . . this *highly disturbing* post on social media *is merely the beginning* . . .  (Emphasis added.)

27.     The ESD then publicly disseminated its above "response" to Ms. Skidmore's acknowledged protected speech to the online news journal, "NextShark."  NextShark, in turn, wrote and published an article incorporating the above response, expressly calling Ms. Skidmore a "racist."

- 8 -

28.     Things began moving very fast at this point.  On April 2, 2020 defendant Gilbert, acting in his official capacity as UCSC ESD "Department Chair," caused an email to be disseminated to the entire environmental studies "community" under the topic of "Xenophobia Forum," again hysterically labeling Ms. Skidmore's post as "blatant racism[1], xenophobia[2], and a call for genocide[3]."

29.     As a result of the ESD faculty's publication of this "defamatory statement," as well as Gilbert's gratuitous, defamatory email, Ms. Skidmore immediately suffered from online ridicule, and, more seriously, she began receiving numerous negative comments and threats, including death threats. Ms. Skidmore reported these threats to, among other faculty members, Daniel Press and Greg Gilbert, and she asked them to stop the public damning and shaming.  However, their reactions were to disregard her fear, humiliation and emotional trauma in reaction to the rabid onslaught of hate mail and death threats.

30.     On April 3, 2020, the UCSC ESD Diversity Committee published yet another statement, this time to the entire UCSC Campus and in so doing so, published only parts of Ms. Skidmore's Facebook post, but deleting her language that put her statement sin context:

> Earlier this week, an ESD Graduate Student posted on Facebook stating, amongst other things, that "There is a special place in hell reserved for the f*ing Chinese and their archaic culture... I hate Trump with every fiber of my being but his description of the Covid-19 as the Chinese Virus is the most accurate thing he's ever said - I wish it had wiped the whole country off the planet."
>
> Ever since the Facebook Post, the ESD Diversity Committee has received a number of inquiries . . .
>
> Statement:

---

[1] A belief that race is the primary determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race. "Racism." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/racism. Accessed 16 Apr. 2020.

[2] Fear and hatred of strangers or foreigners or of anything that is strange or foreign. "Xenophobia." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/xenophobia. Accessed 16 Apr. 2020.

[3] The deliberate and systematic destruction of a racial, political, or cultural group. "Genocide." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/genocide. Accessed 16 Apr. 2020.

We welcome the fact that the ESD department met immediately to discuss this incident and *wrote a public statement in condemnation*.  We also welcome the general agreement that this public statement is first of a series of follow-up steps. We believe that three concrete follow-up steps are required.  *First, it is critically important to undertake a full and thorough investigation of this individual who posted this virulently racist and hateful message. We need to know who her interlocutors were; whether she has other, possibly physically violent, partners; whether she has access to guns or other means of causing bodily harm*; and whether she has supporters of her viewpoints amongst the graduate student community and perhaps even the faculty. As things stand, we do not have definitive answers to these important questions, and in the absence of these answers, some amongst us are fearful for our health, safety and wellbeing.  *The only way forward is to request the law enforcement authorities to investigate*.  This is hate speech; there are norms that we must follow; *and amongst these should be a call for an independent investigation, and a commitment by the department to fully cooperate and furnish evidence*.

Secondly, we need to systematically investigate how and why our pedagogical processes have failed . . . How is it that a product of our department could spew a narrative that is very similar in its key assumptions to what political theorists call Ecologism -- a right wing "green" neo-Malthusian ideology with deeply pernicious historical roots, including Nazism? . . .

Last, but by no means least, we urge the campus community at large to engage in a thoughtful conversation about diversity. . . We, as a scholarly community, must perpetually work to address both the kinds of overt racism . . .  (Emphasis added.)

31.     The Diversity Committee is composed of three ESD faculty members: Defendants Rajan, Fairbairn, and Lu.

32.     The Diversity Committee's above "statement" takes Ms. Skidmore's Facebook post completely out of context by ignoring the animal rights and cruelty subject matter or that it followed the earlier post of P.H., and by instead, only posting some of the words related to the Chinese Government's plan to use bears.

33.     Contrary to the Department's misleading, published mischaracterizations of Ms. Skidmore's Facebook post, which followed upon P.H's own earlier Instagram post, the post in fact reads as follows:

If you thought things would change in China due to the outbreak, think again. There's a special place in hell reserved for the f*ing Chinese and their archaic culture.  Chian's [*sic*] state run news agency is now recommending bear bile (one

of the cruelest forms of animal torture) as a treatment for Covid-19. I knew the 'wildlife ban' in China was just a façade. Traditional medicines containing threatened wildlife parts, such a pangolin scales, tiger bones, saiga horn, rhino horn, and the bile of captive-bred bears will continue to be sold in China. I hate Trump with every fiber of my being but his description of Covid-19 as the Chinese Virus is the most accurate thing he's ever said- I wish it had wiped the whole country off the planet.

34.     In their statement condemning Ms. Skidmore, the Diversity Committee strongly suggested and threatened that follow-up "steps" needed to be taken in response to Ms. Skidmore's post. These steps included a "full and thorough investigation" of Ms. Skidmore, including finding out who "her interlocutors were; whether she has other, possibly physically violent, partners; whether she has access to guns or other means of causing bodily harm; and whether she has supporters of her viewpoints amongst the graduate student community and perhaps even faculty." This was the hysterical over-reaction to which Ms. Skidmore was subjected by her own Department.

35.     On April 5, 2020, Ms. Skidmore emailed the ESD faculty, informing them *again* that her Facebook post was being republished out of context.

36.     Meanwhile, by April 7, 2020, the internal investigation had gone forward, and the investigation concluded Ms. Skidmore should not be disciplined. The investigator concluded she had not made a credible threat of violence, and stated: "Based on Allison's private Facebook, this does not appear to be a veiled threat." He also found there was no credible evidence of harassment based upon the one post. He observed: "Speech protected by the First Amendment of the United States Constitution does not constitute harassment . . . the speech was not directed to specific students, staff or faculty. . ." The investigator concluded finally that "[a] reasonable person would likely see this as offensive hyperbole and . . . would not reach the . . . definition where a reasonable person fears bodily harm or death." The investigator closed the incident report by noting: "No policy violation – closed."

37.     The investigator's April 7, 2020 formal assessment email with the subject line, "Graduate student who wrote xenophobic content on her personal fb page," which concluded that the Ms.

Skidmore's post does not constitute a "policy violation," was sent in response to a request for a formal assessment from to Garret Naiman, the Associate Vice Chancellor and Dean of Students at UCSC. The investigator's formal assessment email was also carbon copied to Linda Scholz.

38.     Ignoring the investigator's conclusions and Ms. Skidmore's rights, and apparently not being satisfied in rubbing her nose in what was at worst a mistake, on April 10, 2020, the UCSC ESD faculty published yet another damaging statement regarding Ms. Skidmore, as follows:

> Dear Environmental Studies Undergraduates,
>
> You may have heard the reports that a member of our student community posted appalling, hateful, and violent comments on social media. _The comments were disturbingly xenophobic and deeply hurtful_ not only to the community it targeted, but to **all** of us.
>
> _As a faculty, we are outraged and saddened_ that a member of our student community could express these views, and additionally demonstrate profound thoughtlessness and poor judgment in making such abhorrent views public. _We denounce the views expressed in this comment_ in the strongest possible terms. Such views are an antithesis to our core values as a department, and to the UCSC Principles of Community.   . . .
>
> The undersigned Environmental Studies faculty.  (Emphasis added.)

39.     This denunciation directed at Ms. Skidmore, and published to all the UCSC ESD undergraduate students, including those Ms. Skidmore had taught, inaccurately characterizes Ms. Skidmore as "disturbingly xenophobic," and again demonstrate the _de facto_ shaming and punishment of Ms. Skidmore.

40.     These publications by defendants Gilbert, Fairbairn, Lu, and Rajan, were false, as Ms. Skidmore is not racist, xenophobic, or genocidal, nor has she ever been known to be racist, genocidal, or xenophobic, but for the false and defamatory publications of the Defendants, which placed her in a false light.

41.     The publications by defendants Gilbert, Fairbairn, Lu, and Rajan were made with knowledge of their falsity or with reckless disregard for the truth, as demonstrated by Defendants' swift

April 2, 2020 defamatory response, which placed Ms. Skidmore in a false light of being racist, xenophobic, and genocidal, without waiting for completion of the internal investigation, as well as Defendants' additional defamatory publication on April 10, 2020, after the investigation was closed with the official assessment being no policy violation of UCSC rules.

42.     The actions of defendants Gilbert, Fairbairn, Lu, and Rajan constituted *de facto* discipline on Ms. Skidmore. These actions and the *de facto* discipline imposed on Ms. Skidmore would chill a person of ordinary firmness from continuing to engage in the protected activity.  In fact, in this case, Ms. Skidmore was instructed by UCSC faculty to delete her entire Facebook page.  Further, the *de facto* discipline on Ms. Skidmore has already chilled her protected speech activities.

43.     Defendants acknowledged as early as April 2 that Ms. Skidmore's comments were private, and that their "official" disciplinary options were circumscribed.  Moreover, based on the final results of the internal investigation on April 7, 2020, finding that Ms. Skidmore's speech was protected speech under the United States Constitution, the Defendants, and each of them, knew or reasonably should have known that imposing *de facto* discipline on Ms. Skidmore would violate her established constitutional rights.  A reasonable person in the position of the Defendants, and each of them, would know, or should have known, that imposing *de facto* discipline on Ms. Skidmore would violate her established constitutional rights.

44.     In imposing *de facto* discipline on Ms. Skidmore, Defendants, and each of them, acted in their official capacities and under color of state law, by acting or purporting to act in the performance of their official duties under state laws, ordinances, and regulations.

45.     The actions of the Defendants, and each of them, in imposing *de facto* discipline on Ms. Skidmore for her protected speech, demonstrated reckless indifference to the constitutional rights of Ms. Skidmore.

46.     The Regents have adopted and published policies regarding student free speech and advocacy.

47.     Policy 30.30 states that, "[t]he time, place, and manner of exercising the constitutionally protected rights of free expression, speech, assembly, and worship are subject to campus regulations that shall provide for non-interference with University functions and reasonable protection to persons against practices that would make them involuntary audiences or place them in reasonable fear, as determined by the University, for their personal safety."

48.     The policies of the Regents were not adequate to prevent violations of law by its employees, including but not limited to defendants Gilbert, Fairbairn, Lu, and Rajan, such as has occurred here.

49.     The Regents of the University of California was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violation of law by its employees.

50.     The policies of the Regents amounted to deliberate indifference to Ms. Skidmore's constitutional rights because the Regents knew or should have known that their failure to implement adequate policies made it highly predictable that its employees, including but not limited to defendants Gilbert, Fairbairn, Lu, and Rajan, would engage in conduct that would deprive persons, such as Ms. Skidmore, of their rights.  The Regents could have prevented violation of Ms. Skidmore's constitutional rights through appropriate policies.

51.     The acts of defendants Gilbert, Fairbairn, Lu, and Rajan deprived Ms. Skidmore of her rights under the First and Fourteenth Amendments to the United States Constitution.

52.     The failure of defendant The Regents to prevent violations of law by its employees caused the deprivation of Ms. Skidmore's rights by defendants Gilbert, Fairbairn, Lu, and Rajan; that is, the failure of The Regents to prevent violations of law by its employees, including but not limited to

defendants Gilbert, Fairbairn, Lu, and Rajan, is so closely related to the deprivation of Ms. Skidmore's constitutional rights to be the motivating force that caused the ultimate injuries to Ms. Skidmore.

53.     Defendant Gilbert had final policy making authority from the Regents, concerning ESD and the Diversity Committee's actions and statements, as described above.

54.     When defendant Gilbert engaged in these acts, (including, but not limited to, the three publications described above), and authorized these statements, he was acting as a final policy maker for the Regents.

55.     Further, Defendant Gilbert ratified the actions and statements of defendants Fairbairn, Lu, and Rajan; that is, Gilbert knew of and specifically made a deliberate choice to approve those actions and publications.

56.     The acts of defendant Gilbert caused deprivation of Ms. Skidmore's rights; that is, Gilbert's acts were sufficiently related to the deprivation of Ms. Skidmore's rights as to be the moving force that caused the ultimate injuries to Ms. Skidmore.

57.     Defendants Gilbert, Fairbairn, Lu, and Rajan acted pursuant to an expressly adopted policy of the Regents by conducting *de facto* discipline and punishment of Ms. Skidmore.  The policy of the Regents resulted from a deliberate choice to follow a course of action made from various alternatives by defendant Gilbert, who was the official responsible for establishing final policy with respect to the *de facto* discipline imposed on Ms. Skidmore.  This policy is elaborated, and was given force and effect by, Defendants' multiple statements published on April 2nd, April 3rd, and April 10th of 2020.

58.     This official policy of the Regents caused the deprivation of Ms. Skidmore's rights by defendants Gilbert, Fairbairn, Lu, and Rajan; that is, the official policy of the Regents is so closely related to the deprivation of Ms. Skidmore's rights as to be the moving force that caused Ms. Skidmore's ultimate injuries.

59.     Ms. Skidmore's privileged and private Facebook post criticizing the Chinese Government for animal cruelty, and which joined in P. H.'s sentiment about animal cruelty by the Chinese Government toward black bears, was none of the UCSC's business.

60.     Ms. Skidmore did not intend for her words to be made public, nor to interfere with University functions, and the comment would have passed without further condemnation, but for the University's and the Department's deliberate republications with its false and inflammatory narratives and mischaracterization that Ms. Skidmore was racist, genocidal and/or xenophobic, when it was clear this was not her point at all, but rather her and other animal rights activists reaction to the news about black bears.

61.     Instead of letting the "event" blow over, the ESD faculty decided to make a "federal case" of it by suggesting they desired to discipline Ms. Skidmore if they could find a way, up to and including reporting her to the police for investigation.  They wondered why someone like her was a Ph.D. candidate, implying she should be removed from the Ph.D program.  Indeed, as alleged below, at least one of her previous faculty advisors has now evaluated her negatively, when before this incident, her reviews were positive.  For example, prior to this incident, one of her committee reviews observed Ms. Skidmore "has proposed a bold, innovative and creative research design for studying endangered tiger poaching in the Russian Far East Amur region.  [¶] Ms. Skidmore's qualifying exam prospectus was very thorough and demonstrated her deep grasp of the phenomena she proposes to study.  The committee is confident that she will be able to carry out the works and looks forward to what she finds. . ."  Other reviews state "Allison is making good progress," and other similar sentiments, such as "Allison is doing great.  Her research on the tiger trade in Russia has developed very nicely. . ."  After the problem of the post and blowback from the faculty, one of her faculty advisor's feedback review was "unsatisfactory."

62.     Ms. Skidmore's post was directed to her "friends" on a private Facebook page.  She is not "racist," and she did not call for the "genocide" of the Chinese.  She is not xenophobic.  Her post was merely, as the University's own investigator concluded, reactive hyperbole, venting her opinions – passionately.

63.     The ESD faculty expressly acknowledged that Ms. Skidmore's post was made on her "private" account, with no affiliation to UCSC, and constituted protected speech.

64.     Nonetheless, the ESD faculty interjected itself and made a mountain out of a molehill, and it took it upon itself to castigate, punish and shame her in three separate publications, each time mischaracterizing her hyperbolic statements, made in a fit of anger by characterizing her as possibly dangerous, "racist," "xenophobe," and as "genocidal," and then publishing these defamatory labels several times to several audiences.  The individual Defendants and the ESD faculty *de facto* disciplined Ms. Skidmore by condemning her, and characterizing her as a "racist" and "xenophobe" to the entire UCSC community through their official written statements.

65.     On April 27, 2020, Ms. Skidmore requested a formal apology be issued by the UCSC ESD for mischaracterizing her as "racist," "xenophobic," and "genocidal" based solely upon her privileged post.  To date, there has been no apology issued informally or formally to Ms. Skidmore, and there has been no retraction.

66.     As a direct and proximate result of the Department's statements and mischaracterization of Ms. Skidmore as racist, Ms. Skidmore has received, and continues to receive, death threats, harassment, hate mail, and suffers from a tarnished reputation.  She was scheduled to appear for a National Geographic program in April 2020 to discuss her work, but that was canceled due to the blowback from the UCSC's published statements.  She was also scheduled to appear on a radio segment with BYU radio's show, "Top of Mind," which, upon information and belief, was also canceled due to the blowback from the UCSC's published statements.

67.     As a result of the condemning statements and mischaracterization by the ESD faculty, Ms. Skidmore has lost one of several career advancement opportunities, including but not limited to, the cancellation of a National Geographic sponsored program and the radio segment on BYU radio's show, "Top of Mind," after the faculty published its "responses" and "statements."

68.     Ms. Skidmore has been informed that the "dissertation committee" now must speak with her and question her about her statements, so as to cause doubt as to her obtaining her Ph.D. by June 2021, as previously promised in mid-March 2020, before the event.

69.     Ms. Skidmore has also been informed that the ESD wants to have a "mediated academic research conversation," as they are now purportedly "concerned" that Ms. Skidmore's research is somehow "skewed" because of the Facebook post, and, as alleged above, one advisor recently gave her an "unsatisfactory" review.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 – Defendant's Violation of the**
**First Amendment to the United States Constitution)**
**Against All Defendants**

70.     Ms. Skidmore repeats and realleges each allegation of Paragraphs 1 through 69 and incorporates them herein by reference.

71.     The First Amendment to the United State Constitution, incorporated to the States by the Fourteenth Amendment to the United States Constitution, guarantees the right to freedom of speech. The First Amendment states: "Congress shall make no law … abridging the freedom of speech."

72.     Ms. Skidmore's repost of P.H.'s earlier post, adding her comment, was made privately, off-campus and was made to her Facebook "friends."  Her statements constitute free speech protected by the First Amendment to the United States Constitution.

73.     Defendants have acknowledged that Ms. Skidmore has a First Amendment right to free speech.

74.     Defendants have further acknowledged Ms. Skidmore's Facebook post was conducted in

a private manner with no affiliation to the school and is private speech.

75.    Defendants were acting intentionally and under the color of state law; and, as such, they published several statements condemning Ms. Skidmore for her constitutionally protected speech, misrepresenting what she said and why she said it, placing her in a false light, and further libelously characterizing Ms. Skidmore as "racist," "xenophobic," and "genocidal."

76.    Defendants have *de facto* disciplined Ms. Skidmore based on her off-campus, private speech, and they have suggested they would like to formally discipline her and subject her to interviews, examination and criminal investigation, and they have suggested that she is possibly dangerous.

77.    Defendants did not, and do not, have a constitutionally justifiable reason to discipline Ms. Skidmore for her private speech.

78.    Defendants violated Ms. Skidmore's First Amendment rights by releasing and publishing official statements to the press and community that condemn Ms. Skidmore for her private speech, and ignoring, and failing to acknowledge and disclose, the animal rights context of her statements.

79.    Additionally, defendant Gilbert, as the Chair of UCSC's ESD, instigated, ratified, and/or approved of all condemning, defamatory statements made by the Department and the Diversity Committee.

80.    Defendants' actions in imposing *de facto* discipline on Ms. Skidmore would chill a person of ordinary firmness from continuing to engage in protected free speech.

81.    Ms. Skidmore's protected activity was a substantial or motivating factor in Defendants' conduct.

82.    As a result of Defendants' conduct, Ms. Skidmore has suffered, and will continue to suffer, irreparable injury due to the Defendants' deprivation of her constitutional rights, and Ms. Skidmore has no adequate remedy at law for the deprivation of these rights.

83.    Ms. Skidmore is entitled to a declaration that Defendants will not impose discipline on

her for her statements, including, but not limited to, continuing *de facto* discipline upon her, a student, for constitutionally protected speech, even if offensive, made to a private audience from her own private means of communication, and unrelated to any school-sponsored activity.

84.     The actions of the Defendants, and each of them, in imposing *de facto* discipline on Ms. Skidmore for her protected speech, demonstrated reckless indifference to the constitutional rights of Ms. Skidmore.  Such deliberate and intentionally oppressive conduct is a proper predicate for an assessment of punitive damages under 42 U.S.C. § 1983.

85.     Ms. Skidmore also is entitled to an award of her reasonable attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 1988(b).

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Defendant's Violation of the
### Fourteenth Amendment to the United States Constitution)
### Against All Defendants

86.     Ms. Skidmore incorporates Paragraphs 1 through 85 of this Complaint as though fully set forth herein.

87.     The right to due process of law as applied to the states is secured by the Fourteenth Amendment to the United States Constitution, which provides that no state "shall … deprive any person of life, liberty, or property, without due process of law."

88.     Ms. Skidmore has entered into a contract with UCSC to the effect that if she completes her study program and pays the fees due, she will receive a Ph.D. in Environment Studies.  Ms. Skidmore has done all the things required of her to date, and, indeed, before this incident, she was promised to receive her Ph.D. early, in May to June of 2021.

89.     Ms. Skidmore has a constitutionally protected property interest in her continued education at UCSC and obtaining her Ph.D. by June 2021 as discussed with her Ph.D. advisor, Daniel Press.

90.     Ms. Skidmore also has a constitutionally protected liberty interest in her good name,

- 20 -

COMPLAINT

reputation, and integrity.

91.     The due process provisions of the Fourteenth Amendment to the United States Constitution apply to the *de facto* disciplinary process used by the ESD against Ms. Skidmore.

92.     Defendants have violated the due process guarantees of the Fourteenth Amendment by condemning Ms. Skidmore's private speech, though no school rule or policy gave Ms. Skidmore fair notice that she could be *de facto* disciplined and shamed by the faculty for her constitutionally-protected comments posted on her private Facebook page while at home, outside school hours, and while not participating in any school-related activities.

93.     Defendants do not have a clear, or any, policy regarding off-campus speech, and to the extent that the Defendants maintain that there is such a policy, it is vague, ambiguous, arbitrarily and capriciously enforced.  Indeed, Plaintiff has now learned UCSC conducted a secret investigation during the first week of April 2020, which concluded she had violated no UCSC policy.

94.     Defendants investigated Ms. Skidmore's speech and concluded she violated no policy, yet Defendants continue to characterize and portray Ms. Skidmore as "racist," "xenophobe" and "genocidal," among other things, to the community.  Ms. Skidmore was entitled to fundamentally fair procedures, and the ESD failed to provide adequate due process prior to releasing its public statements condemning Ms. Skidmore.  Defendants continued to do so even though UCSC's formal assessment and investigation concluded she had not violated any policy and her speech was protected.

95.     As a result of Defendants' conducts, Ms. Skidmore has suffered irreparable injury and will continue to suffer injury without an adequate remedy at law.

96.     Ms. Skidmore is entitled to an award of her reasonable attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 1988(b), as well as special damages for her loss of current and future academic and career opportunities.

97.     Ms. Skidmore is also entitled to injunctive relief directing the Defendants to be fair and

impartial when assessing Ms. Skidmore's dissertation and comply in good faith to ensure that Ms. Skidmore timely graduates and obtains her Ph.D. in June 2021.

**THIRD CAUSE OF ACTION**
**(Violation of Plaintiff's Right to Privacy – False Light)**
**Against All Defendants**

98.     Ms. Skidmore realleges and reincorporates Paragraphs 1 through 97 as fully set forth herein.

99.     Defendants publicly published and disclosed materials which showed Ms. Skidmore in a false light, out of the context of the dialogue in which she was participating, as well as the scope of the communications to which she was reposting.

100.     Rather than recognizing that Ms. Skidmore was reacting to earlier posts, that she was a passionate animal rights activist, and that she was employing hyperbole, not making actual threats, but reacting to animal cruelty, the faculty added fuel to the fire and mischaracterized her statements and placed her in a false light.  The publications by the ESD were misleading and put her in the false light of a racist, a xenophobe, and a holocaust promoter, when what anyone can see from a plain reading of her post is that she is a passionate defender of animal rights, speaking out with other like-minded activists who were saying essentially the same thing.

101.     The false light created by Defendants' disclosure is, and would be, highly offensive to a reasonable person in Ms. Skidmore's position.

102.     Defendants failed to properly investigate the context of Ms. Skidmore's private speech and to calibrate their response prior to releasing official statements to the community that called Ms. Skidmore "racist," "xenophobic," and "genocidal."

103.     Defendants knew that not having all the facts surrounding Ms. Skidmore's speech prior to releasing an official statement to the community would create a false impression about Ms. Skidmore, or after she had been "cleared," they continued to do the same thing.  Even after the internal investigation

found she had violated no policy, ESD continued to issue false statements, portraying her in a false light.

104.    Defendants acted with reckless disregard for the truth by failing to investigate the facts and circumstances as to Ms. Skidmore's private speech prior to releasing statements that characterize Ms. Skidmore as "racist," "xenophobic," and "genocidal," or by ignoring UCSC's own investigator and continuing to publish false and defamatory statements.

105.    Defendants Gilbert, Fairbairn, Lu, and Rajan were acting as agents of the Regents, when they published their false and defamatory statements, portraying Ms. Skidmore in a false light.

106.    Defendants Gilbert, Fairbairn, Lu, and Rajan were acting within the scope of their agency when they harmed Ms. Skidmore.

107.    In conducting these acts or omissions, Defendants, and each of them, acted deliberately and intentionally and with oppression, fraud or malice.

108.    As a result of Defendants' conduct, Ms. Skidmore has suffered irreparable injury and damage, and she will continue to suffer injury, including but not limited to injury to her reputation (both personally and professionally), and she has suffered emotional distress.

109.    As a result of Defendants' actions, Ms. Skidmore has lost out on, and will more likely than not, continue to lose out on career opportunities, including but not limited to, the opportunity to speak about her research with National Geographic and a radio segment with BYU radio's show Top of Mind.

110.    As a result of Defendants' actions, Ms. Skidmore has received and continues to receive death threats, hate mail, and has been subject of numerous lectures and debates at the university, putting her in a false light and causing her emotional distress.

111.    Defendants' conduct was a substantial factor in causing Ms. Skidmore's harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Skidmore respectfully prays for judgment to be entered against the

- 23 -

Defendants, The Regents of the University of California, Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan, as follows:

## ON THE FIRST CAUSE OF ACTION

1.      Declaratory relief declaring the Defendants' conduct, as set forth above, violated Plaintiff's Constitutional rights to free speech;

2.      Preliminary and permanent injunctions requiring Defendants, all other officers, employees, and agents of UCSC, and all other persons in active concert or participation with them, to comply in good faith, and to work with Ms. Skidmore in completing and obtaining her Ph.D. by June 2021 and to cease their defamation, discipline and shaming;

3.      An award for reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 1988;

4.      An award for general, special, presumed, and nominal damages according to proof, against defendants Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan;

5.      For punitive damages against defendants Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan.

## ON THE SECOND CAUSE OF ACTION

1.      Declaratory relief declaring the Defendants' conduct, as set forth above, violated Plaintiff's Constitutional rights to due process;

2.      Preliminary and permanent injunctions requiring Defendants, all other officers, employees, and agents of UCSC, and all other persons in active concert or participation with them, to comply in good faith, and to work with Ms. Skidmore in completing and obtaining her Ph.D. by June 2021 and to cease their defamation, discipline and shaming;

3.      An award for reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 1988;

4.      An award for general, special, presumed, and nominal damages according to proof, against defendants Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan; and

COMPLAINT

5.      For punitive damages against defendants Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan.

## ON THE THIRD CAUSE OF ACTION

1.      Permanent injunction requiring Defendants to cease their defamation, discipline, shaming, and placing Ms. Skidmore in a false light;

2.      An award for general, special, presumed, and/or nominal damages according to proof; and

3.      For punitive damages, pursuant to California Civil Code § 3294.

## ON ALL CAUSES OF ACTION

1.      An award for reasonable attorney's fees and costs; and

2.      For such other, further, equitable or general relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff ALLISON SKIDMORE hereby demands a jury trial in this matter.

Dated: September 11, 2020

ELLIS LAW GROUP LLP

By  _/s/ Mark E. Ellis_____
    Mark E. Ellis
    Attorney for Plaintiff
    ALLISON SKIDMORE

COMPLAINT