1

2

3

UNITED STATES DISTRICT COURT

4

NORTHERN DISTRICT OF CALIFORNIA

5

SAN JOSE DIVISION

6

7
ALLISON SKIDMORE,

8
               Plaintiff,

9
      v.

10
GREGORY S GILBERT, et al.,

11
               Defendants.

Case No.  20-cv-06415-BLF

**ORDER GRANTING MOTION TO
DISMISS WITHOUT LEAVE TO
AMEND; GRANTING MOTION TO
STRIKE; DENYING MOTION FOR
LEAVE TO AMEND**

[Re:  ECF Nos. 60, 74]

12

13

14
     This case concerns the fallout from an offensive post made by Plaintiff Allison Skidmore,

15
an animal rights activist and then-Ph.D. candidate at the University of California, Santa Cruz, on

16
her personal Facebook page.  An Asian-American online news company picked up the post, which

17
then attracted viral attention and was brought to the attention of university officials.  Several

18
faculty members and the Environmental Studies Department issued three statements condemning

19
Skidmore's comments, which Skidmore alleges resulted in "de facto discipline" and shunning by

20
her fellow students and the Department.  Skidmore brings claims under 28 U.S.C. § 1983 for

21
violations of her First and Fourteenth Amendment rights and under California law for false light

22
invasion of privacy.

23
     Defendants—all faculty members at the time of these events—move to dismiss all the

24
claims under Federal Rule of Civil Procedure 12(b)(6) and strike the California state law claim

25
under California's anti-SLAPP law, Cal. Civ. Proc. Code § 425.16.  ECF No. 60 ("Mot."); *see*

26
*also* ECF No. 63 ("Reply").  Skidmore opposes the motions and asks for leave to file a Second

27

28

United States District Court
Northern District of California

1    Amended Complaint.  ECF Nos. 61 ("Opp."), 74 ("MLTA"), 74 Ex. A ("SAC")[1].  Defendants

2    oppose Skidmore's motion for leave to amend.  *See* ECF No. 79.  For the reasons discussed on the

3    record at the December 2, 2021, hearing and explained below, Defendants' motions to dismiss and

4    strike are GRANTED WITHOUT LEAVE TO AMEND and Skidmore's motion for leave to

5    amend is DENIED.

6    **I.    BACKGROUND**

7         The Court takes the following facts, assumed to be true, from the operative First Amended

8    Complaint, except as noted below.  ECF No. 59 ("FAC").

9         **A.    Skidmore's Facebook Post**

10        Plaintiff Allison Skidmore was a Ph.D. candidate at the University of California, Santa

11   Cruz ("UCSC").  FAC ¶ 13.  Following her passion as an animal rights activist, Skidmore's Ph.D.

12   focus was on the wildlife trafficking of endangered animals, specifically Amur tigers, in the Far

13   East.  *Id.*  As part of her Ph.D. research, Skidmore traveled to Russia in early 2020 to investigate

14   the poaching of Amur tigers and their trafficking to China.  *Id.*  There she conducted interviews of

15   individuals directly involved in poaching and smuggling of tigers and other animals.  *Id.* ¶ 15.  At

16   the time of the events underlying this lawsuit, Skidmore was on track to finish her thesis and

17   receive her Ph.D. by June 2021.  *Id.* ¶¶ 13, 15.

18        On March 29 or 30, 2020, Skidmore saw a post on Instagram by "P.H." depicting

19   endangered Asiatic black bears.  FAC ¶ 18.  The caption of the post stated that "[a]ccording to

20   China's state run Xinhua News Agency," China was "recommending bear bile injections as a

21   treatment for COVID-19."  *Id.*  Bear bile, the post said, "is a digestive fluid produced by the liver

22   and stored in the gallbladder" and "harvested" through "invasive surgery" from endangered

23   Asiatic bears.  *Id.*  China's existing ban on consuming "most terrestrial wild animals as food in the

24   _____

25   [1] Skidmore has withdrawn her request to include Dr. Teresa Maria Linda Scholz as a defendant in

26   her proposed Second Amended Complaint and provided a revised proposed Second Amended

27   Complaint.  ECF No. 82.  That revised version only removes Dr. Scholz as a defendant, which the

28   Court will consider in evaluating the motion for leave to amend.

United States District Court
Northern District of California

United States District Court
Northern District of California

wake of coronavirus," the post said, did not cover "use of wildlife products in traditional Chinese medicine." *Id.* "P.H." alleged that she had witnessed bile harvesting from "bears in crusher cages year after year," and that the news made her "so f… angry right now." *Id.*

The Instagram post made Skidmore "incensed, outraged and sickened." FAC ¶ 19. On her private Facebook page, Skidmore reposted P.H.'s Instagram post, adding the following:

> If you thought things would change in China due to the outbreak, think again. There is a special place in hell reserved for the f*ing Chinese and their archaic culture. Chian's [*sic*] state run news agency is now recommending bear bile (one of the cruelest forms of animal torture) as a treatment for Covid-19. I knew the 'wildlife ban' in China was just a facade. Traditional medicines containing threatened wildlife parts such as pangolin scales, tiger bones, saiga horn, rhino horn and the bile of captive-bred bears will continue to be sold in China. I hate Trump with every fiber of my being but his description of Covid-19 as the Chinese Virus is the most accurate thing he's ever said- I wish it had wiped the whole country off the planet.

FAC ¶ 34; *see* Gilbert Decl., ECF No. 60-4, Ex. 1 (screenshot of Skidmore's post).

### B.    UCSC Becomes Aware of the Post and Launches an Investigation

On March 31, 2020, faculty members in the Environmental Studies Department ("ENVS") at UCSC received an email from an anonymous sender that included a screenshot of Skidmore's Facebook post. FAC ¶ 22. The post had apparently been shared with NextShark—an online publication focusing on issues confronting Asian-Americans—which had then published an article condemning the post. *Id.* There is no allegation that Defendants accessed Skidmore's private Facebook post. That same day, Skidmore's Ph.D. advisor Professor Daniel Press confronted Skidmore about her post during a discussion with her about her research. *Id.* Professor Press informed Skidmore that the ENVS faculty had met and would issue a response. *Id.* ¶ 23. Skidmore, allegedly "acting under duress," emailed an apology to Professor Press and the ENVS faculty prior to the statement issuing. *Id.*

Part of the response to Skidmore's post allegedly involved an investigation by UCSC for the purpose of determining whether it should formally discipline her. FAC ¶ 25. The investigator's "preliminary thought" on April 1, 2020—communicated at that time to Defendants—was that Skidmore's post was "protected speech under the First Amendment." *Id.* By April 7, 2020, the internal investigation had concluded that Skidmore should not be disciplined

1    under UCSC policy because her speech was protected by the First Amendment and was not a

2    "credible threat of violence" or "harassment . . . directed to specific students, staff or faculty."  *Id.*

3    ¶ 40.  In accordance with these findings, UCSC did not formally discipline Skidmore for her post.

### C.    Faculty Members Respond to Skidmore's Post

5         Although UCSC did not formally discipline her, Skidmore alleges that she suffered "de

6    facto discipline" through the Defendants' responses to her post.  FAC ¶¶ 4, 47, 48.  Between April

7    2 and 7, 2020, Defendants Gregory S. Gilbert, Madeleine Fairbairn, Flora Lu, and S. Ravi Rajan—

8    all faculty members at UCSC during these events—along with other individual faculty members

9    sent three responses to Skidmore's post.

### i.    April 2, 2020 Statement

11        The first statement, sent to the ENVS graduate student community on April 2, 2020 by

12   Gilbert, Lu, Fairbairn, and other faculty, condemned Skidmore's post as "appalling, hateful, and

13   violent," "disturbingly xenophobic," and "deeply hurtful."  *Id.* ¶ 26; *see also* Gilbert Decl. Ex. 2 at

14   1–2.[2]  The statement "denounce[d] the views expressed in this student's comment in the strongest

15   possible terms" and said the views were "an antithesis to our core values as a department, and to

16   the UCSC Principles of Community."  FAC ¶ 26.  The statement recognized that the "views were

17   expressed on a private social media account, without any formal UCSC affiliation," so UCSC's

18   "disciplinary options are circumscribed."  Gilbert Decl. Ex. 2 at 1.  Nevertheless, the statement

19   said that "the freedom of expression is not just a right" and argued that "[w]ith it comes a

20   responsibility to nurture and care for **all** in our community, and to use that freedom in the service

_____

22   [2] The Court finds that the full statements made by ENVS faculty members—attached to

23   Defendants' motions as Exhibits 2 and 3 to the Gilbert Declaration and Exhibit 2 to the Lu

24   Declaration—are incorporated into the FAC by reference.  *See* FAC ¶¶ 26, 31, 42 (partially

25   quoting the statements).  They are thus appropriate to consider on a motion to dismiss.  *See Khoja*

26   *v. Orexigen*, 899 F.3d 988, 1002 (9th Cir. 2018) (incorporation by reference doctrine "treats

27   certain documents as though they are part of the complaint itself" where complaint "refers

28   extensively to the document[s]").

United States District Court
Northern District of California

of social justice in our practices, research, and teaching." *Id.*  The statement said that the "hate speech has no place in our community" and promised that the response was "merely the *beginning* of a much longer-term conversation about how we can grapple with issues of systemic and institutional racism." *Id.* at 1–2.  The statement was signed by nineteen ENVS faculty members. *Id.* at 2.  The statement did not mention Skidmore by name.  *Id.* at 1–2.

Skidmore alleges that, in addition to sending the statement to the ENVS graduate community, Defendants also sent the statement to NextShark.  FAC ¶ 28.  The next day, Gilbert allegedly sent an additional email to the ENVS community labeled "Xenophobia Forum" in which he labeled Skidmore's post as "blatant racism, xenophobia, and a call for genocide."  *Id.* ¶ 29. Skidmore claims that she suffered from online ridicule and received negative comments and death threats, which she reported to faculty members (who allegedly took no action).  *Id.* ¶ 30.

### ii.    April 3, 2020 Statement

On April 3, 2020, Fairbairn, Lu, and Rajan—each a member of the ENVS Diversity Committee—released an additional statement regarding the Facebook post.  FAC ¶ 31; *see also* Lu Decl., ECF No. 60-6, Ex. 2.  The statement was labeled "ENVS DIVERSITY COMMITTEE FACULTY RESPONSE" and marked "For Internal Circulation amongst the UCSC Campus Community only."  Lu Decl. Ex. 2.  The statement first quoted part of Skidmore's Facebook post. FAC ¶ 31.  The statement said the committee "welcome[d] the fact that the ENVS department met immediately to discuss this incident and wrote a public statement in condemnation."  *Id.*  The statement called for three "concrete follow-up steps."  *Id.*  First, it called for a "full and thorough investigation of this individual who posted this virulently racist and hateful message," including whether she was working with others, had "access to guns or other means of causing bodily harm," and whether there were "supporters of her viewpoints amongst the graduate student community and perhaps even the faculty."  *Id.*  Second, the statement called for an investigation of how a Ph.D. student "who has passed the core curriculum" of ENVS could make those "hateful statements without any understanding of the basic historical facts that belie their claims" and "spew a narrative" similar to right wing ideologies, "including Nazism".  Lu Decl. Ex. 2.  Finally, the statement called for the campus community to "engage in a thoughtful conversation about

diversity" and "work to address both the kinds of overt racism depicted in th[e] Facebook post and the more systemic, everyday forms of racism experienced by some of our faculty and students." *Id.* The statement did not name Skidmore.

Skidmore alleges that the statement was intended to "condemn, harass, punish, and vilify" her, and that it was a "hysterical over-reaction" to her Facebook post. FAC ¶¶ 35, 36. Skidmore again emailed the ENVS faculty and told them that her Facebook post was being taken out of context. *Id.* Behind the scenes, Skidmore alleges that faculty members, including Defendants, were aiming to punish her. Fairburn suggested that they use a conduct hearing process to "discipline someone [who is] spreading hate and fear within our community." *Id.* ¶ 33. Other faculty members expressed concern about the Diversity Committee's statement, with one saying that the response created a "big big mess now" because of the "tacit punishment [of] alienation from colleagues and mentors in the department." *Id.* ¶ 38. Another faculty member observed in an internal email that the department had "acted in a panicked way without thinking too much about [Skidmore]'s situation" and that the "diversity letter was written in an inappropriate way." *Id.* ¶ 39.

### iii.    April 10, 2020 Statement

On April 10, 2020, Gilbert sent a statement to the undergraduates in ENVS. FAC ¶ 42; *see also* Gilbert Decl. Ex. 3. The statement largely tracked the statement sent to the ENVS graduate students on April 3, 2020. *Compare* Gilbert Decl. Ex. 3 (statement to ENVS undergraduates), *with id.* Ex. 2 (statement to ENVS graduate students). The statement did not mention Skidmore by name.

### D.    Aftermath

Skidmore alleges that the three statements constituted "de facto discipline" on her by condemning her and calling her a "racist" and a "xenophobe" to the UCSC community. FAC ¶¶ 46, 56. Skidmore says she has continued to receive death threats, harassment, and hate mail since the statements were released. *Id.* ¶ 58. She was scheduled to appear on a National Geographic program and a radio segment on BYU's radio show "Top of Mind" to discuss her research, but both appearances were cancelled. *Id.* Skidmore alleges that she has also lost one of

United States District Court
Northern District of California

6

United States District Court
Northern District of California

several career advancement opportunities.  *Id.* ¶ 59.

Skidmore further alleges that she has suffered consequences on campus.  She alleges that she was "dissuaded" from attending an ENVS graduate student forum because other students "would not feel comfortable if [she] attended and felt like they would not feel safe speaking out about their lived experiences as students of color on campus and in the department."  *Id.* ¶ 61. Skidmore claims that her Ph.D. graduate committee changed members as advisors "had to either drop out of the committee or were biased in issuing out 'unsatisfactory' annual reviews."  *Id.* ¶ 62. Skidmore was also informed that ENVS became "concerned" that her research may have been "skewed" due to her Facebook post.  *Id.* ¶ 63.

According to additional allegations in the proposed Second Amended Complaint, Skidmore graduated and obtained her degree on time in June 2021.  SAC ¶¶ 77–78.  Since her graduation, Skidmore has applied to at least sixteen academic positions, but "has not heard back" from any of them.  *Id.* ¶ 78.  Skidmore has not obtained a university position, such as an entry-level professorship or post-doctoral appointment, which she attributes to Defendants' statements. *Id.* ¶ 79.

### E.    This Lawsuit

Skidmore filed her complaint in this Court on September 11, 2020, against Defendants and the Regents of the University of California.  ECF No. 1.  The Court granted Defendants' motion to dismiss the original complaint.  *Skidmore v. Regents of the University of California*, 2021 WL 843195 (N.D. Cal. Mar. 5, 2021) ("*Skidmore I*").  That order (1) dismissed the Regents with prejudice because they are protected from suit by Eleventh Amendment sovereign immunity; and (2) found Skidmore's claims against the individual Defendants inadequately pled.  *Id.* at *1–2. The Court deferred ruling on Defendants' motion to strike because it granted Skidmore leave to amend her claims against the individual Defendants.  *Id.* at *2–3.

Skidmore filed the operative First Amended Complaint on May 3, 2021, asserting two claims for violation of 42 U.S.C. § 1983 for violation of her First and Fourteenth Amendment rights and one claim under California law for false light invasion of privacy.  *See* FAC. Defendants have moved to dismiss all claims and strike the state law claim.  *See* Mot.

1    Just over a week before the hearing on those motions, Skidmore filed an ex parte

2    application requesting leave to file additional briefing and continue the hearing date.  ECF No. 69.

3    The Court denied that ex parte application, instead permitting Skidmore to file a motion for leave

4    to file an amended complaint.  ECF No. 71.  Skidmore has done so.  *See* MLTA; SAC.

5    Defendants oppose the motion.  ECF No. 79

6    The Court held a hearing on December 2, 2021, during which it discussed Defendants'

7    pending motions and Skidmore's motion for leave to file an amended complaint.

8    **II.    MOTION TO DISMISS**

9    "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

10   claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation*

11   *Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

12   729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts

13   as true all well-pled factual allegations and construes them in the light most favorable to the

14   plaintiff.  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court

15   need not "accept as true allegations that contradict matters properly subject to judicial notice" or

16   "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

17   inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation

18   marks and citations omitted).  While a complaint need not contain detailed factual allegations, it

19   "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

20   on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

21   550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the

22   reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  On a motion to

23   dismiss, the Court's review is limited to the face of the complaint and matters judicially

24   noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v.*

25   *Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

26   Defendants move to dismiss both of the § 1983 claims and the California state law claim

27   under Federal Rule of Civil Procedure 12(b)(6).  *See* Mot. at 5–19.  Defendants argue that the two

28   § 1983 claims are not plausible because (1) the First Amendment claim is barred by the academic

United States District Court
Northern District of California

freedom doctrine, and (2) Skidmore has not alleged a deprivation of a constitutionally protected property or liberty interest for the Fourteenth Amendment claim. *Id.* at 5–11. Defendants next argue that they are entitled to qualified immunity on the two § 1983 claims. *Id.* at 11–13. Defendants last assert that the California false light claim is barred by the California Government Code, the common interest privilege, the academic freedom doctrine, and the First Amendment. *Id.* at 13–19. While Defendants' other arguments appear compelling, the Court need not reach them because it agrees with Defendants' second argument: that they are entitled to qualified immunity on the § 1983 claims.[3]

### A.   Qualified Immunity – Legal Standard

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss*, 134 S. Ct. 2056, 2066–67 (2014) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) (establishing the two-part test). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The Supreme Court recently reiterated the longstanding principle that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). Defining the right at too high a level of generality "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Ricard*, 134 S. Ct. 2012, 2023 (2014)). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. There can be "the

---

[3] The Court does not reach the arguments for dismissal of the false light claim because it grants Defendants' motion to strike that claim. *See infra* Section III.

1  rare 'obvious case,' where the unlawfulness of the [official's] conduct is sufficiently clear even

2  though existing precedent does not address similar circumstances." *Vazquez v. City of Kern*, 949

3  F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590).  The relevant inquiry is

4  "whether the [official] had fair notice that her conduct was unlawful." *Nicholson v. City of Los*

5  *Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152

6  (2018) (per curiam)).

### B.   Qualified Immunity – Discussion

#### i.   Prong 1 – Violation of a Constitutional Right

9  The Supreme Court has "warned against beginning with the first prong of the qualified-

10  immunity analysis when it would unnecessarily wade into 'difficult questions' of constitutional

11  interpretation that 'have no effect on the outcome of the case." *Sjurset v. Button*, 810 F.3d 609,

12  615 (9th Cir. 2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236–37 (2009)).  The parties

13  focus their briefing on prong two of the qualified immunity doctrine—whether Defendants

14  violated a "clearly established right" of Skidmore.  *See* Mot. at 12–13; Opp. at 10–11; Reply at 6–

15  7.  The Court agrees that its analysis should focus on prong two.  The Court will not delve into

16  those potentially difficult issues at prong one of whether a constitutional violation occurred and

17  will instead exercise its "discretion to apply the second prong of the *Saucier* test at the outset."

18  *Sjurset*, 81 F.3d at 615.

#### ii.   Prong 2 – Violation of Clearly Established Right

20  At several points in the First Amended Complaint, Skidmore makes reference to her

21  "clearly established constitutional right to free speech."  FAC ¶ 40; *see, e.g.*, *id.* ¶¶ 55 (posting on

22  private Facebook account was "clearly established constitutional right"), 67 ("clearly established

23  First Amendment right to free speech"), 69 ("clearly established constitutionally protected

24  speech"); *see also id.* ¶¶ 5, 26, 87 (similar).  She also references a "clearly established

25  constitutionally protected property interest in future employment" and "a liberty interest in her

26  free speech." *E.g.*, *id.* ¶ 83.  Defendants argue that Skidmore's allegations do not meet her burden

27  to identify a clearly established right that they allegedly violated.  Mot. at 12.  The allegations

28  define the clearly established right at too high a level of generality, Defendants say.  *Id.* at 12–13

United States District Court
Northern District of California

1   (citing *al-Kidd*, 563 U.S. at 743).  Skidmore responds that she has alleged that "Defendants were

2   aware that Skidmore's private Facebook post was protected speech" and that their conduct would

3   "chill" that speech.  Opp. at 10–11.

4         The Court agrees with Defendants that prong two is not satisfied.  As an initial matter,

5   Skidmore has misapprehended the nature of the inquiry at prong two.  Skidmore has defined that

6   right in terms of her own actions—i.e., that she had a clearly established First Amendment right to

7   post on her private Facebook page or a clearly established property interest in future employment.

8   *See, e.g.*, FAC ¶¶ 40, 83.  But the "clearly established right" at prong two is phrased in terms of

9   how Defendants' actions violate that right.  *See, e.g.*, *Reichele v. Howards*, 566 U.S. 658, 665

10  (2012) (right to "be free from a retaliatory arrest that is otherwise supported by probable cause");

11  *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) ("whether to shoot a disturbed felon, set on

12  avoiding capture through vehicular flight, when persons in the immediate area are at risk from that

13  flight").  This framing dovetails with the Supreme Court's most common admonition in qualified

14  immunity jurisprudence:  that the analysis "must be undertaken in light of the specific context of

15  the case, not as a broad general proposition."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting

16  *Brosseau*, 543 U.S. at 198).

17        Skidmore's framing of the alleged "clearly established right" fails to meet these standards.

18  The Court does not doubt that Skidmore has a First Amendment right to post on her private

19  Facebook page.  But the question is whether Defendants violated a "clearly established" right

20  through their own actions.  More properly framed for this case, the question at prong two might

21  be:

22        Whether it was clearly established in April 2020 that university
          professors seeing a student's social media post which they deem to be
23        racist and xenophobic violate the student's constitutional rights by
          speaking out to the university community about the post and its effect
24        on the university community.

25  Skidmore has not framed the "clearly established right" at that level of specificity, instead only

26  pointing to her own First Amendment rights.  Even looking to her broader theory of "de facto"

27  punishment resulting from Defendants' statements, her counsel has conceded that that theory is

28  "novel" and has no analogue in case law.  *See* 12/2/21 Hrg. Tr. at 28:10–14.  That admission alone

United States District Court
Northern District of California

11

1    suggests that Defendants' actions could not have violated clearly established law.

2           The two cases Skidmore points to in opposition to Defendants' qualified immunity

3    argument are inapposite.  Opp. at 10–11 (citing *Bracken v. Okura*, 869 F.3d 771 (9th Cir. 2017),

4    and *O'Brien v. Welty*, 818 F.3d 920, 933, 956 (9th Cir. 2016)).  In *Bracken*, the Ninth Circuit held

5    that qualified immunity was unavailable to an off-duty police officer who was acting as a private

6    security guard.  *Bracken*, 869 F.3d at 777–78.  The court examined that question in light of the

7    Supreme Court's guidance to determine whether qualified immunity was "generally available" to

8    certain classes of individuals—by looking to whether "[h]istory . . . reveals a 'firmly rooted'

9    tradition of immunity" and whether immunity would "serve the purposes underlying the immunity

10   doctrine"—before evaluating its possible application in a given case.  *Id.* at 776–77.  The court

11   concluded that there was no such "firmly rooted" tradition of immunity for off-duty police officers

12   acting as private security guards and that the availability of immunity to those individuals would

13   not further the purposes of qualified immunity.  *Id.* at 777–78  Because qualified immunity was

14   unavailable to the defendant, the court did not proceed to analyze whether it was warranted in that

15   given case.  *Id.*  Here, in contrast, there is a "firmly rooted" tradition in affording university

16   professors protection for speaking out on matters of public concern.  *See, e.g.*, *Rodriguez v.*

17   *Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 707–09 (9th Cir. 2010) ("We therefore doubt that

18   a college professor's expression on a matter of public concern, directed at the college community,

19   could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs

20   seek."); *Furmoto v. Lyman*, 362 F. Supp. 1267, 1280–82, 1285 (N.D. Cal. 1973) (dismissing

21   plaintiff's § 1983 claims against university and professor based on student's discipline for

22   interrupting professor's class due to professor's beliefs about eugenics).  Because qualified

23   immunity is available to university professors at a general level, *Bracken* is inapposite.

24          *O'Brien* is similarly distinguishable.  In *O'Brien*, the Ninth Circuit found that defendant

25   faculty members and administrators were not entitled to qualified immunity in a § 1983 lawsuit.

26   818 F.3d at 936.  Plaintiff Neil O'Brien, a student at Fresno State, became an "outspoken critic" of

27   the faculty and administration and a prominent conservative voice on campus.  *Id.* at 924.  He

28   posted online criticism of the student body president (an undocumented immigrant), criticized

United States District Court
Northern District of California

12

Fresno State's separate graduation for Latino students, and filed public records requests to obtain information on administrator salaries. *Id.* at 925.  In light of these activities, university officials requested that faculty and other students "gather information and complaints to use against" him. *Id.*  After O'Brien confronted a professor in the Chicano and Latin American Studies ("CLS") department and tried to videotape a conversation with her about a poem written by the department and published in the student newspaper, the university sought to discipline him.  *Id.* at 925–26.  After a student disciplinary proceeding at which O'Brien was not allowed a lawyer, the administration prohibited O'Brien from coming within 100 feet of CLS faulty, staff, offices, or classrooms (with exceptions only to attend classes or work on assignments) and from being an officer in student government or the campus chapter of Young Americans for Liberty.  *Id.* at 927.  When O'Brien allegedly violated these conditions by entering a CLS building, campus police followed O'Brien and removed him from the building, despite his claims that he was working on class assignments.  *Id.* at 928.  The court found that defendants were not entitled to qualified immunity because of factual issues regarding whether the university violated O'Brien's clearly established right to be free from retaliation in the form of the university's disciplinary actions for the expression of his views.  *See id.* at 936.  But here, Skidmore has not alleged that the Defendants imposed any actual discipline against her.  Indeed, Skidmore has only alleged "de facto discipline" in the form of shunning by the university community and "threatening to deprive" Skidmore of her Ph.D. and "future career opportunities."  FAC ¶ 4.  And that de facto discipline arises not from any actual alleged disciplinary action, but from the Defendants' own statements in response to Skidmore's Facebook posts.  These allegations are far afield from the concrete actions taken in *O'Brien*, and so that case does not clearly establish a right that Defendants violated.

Skidmore has identified no case clearly establishing a right which Defendants violated, and the Court has located none.  Skidmore no doubt has a First Amendment right to express her views regarding China's alleged use of bear bile as a treatment for COVID-19 on her Facebook page, but she cannot through this lawsuit shut down the First Amendment rights of the university professors to respond to the statements they deemed objectionable.  Defendants are entitled to qualified

1   immunity on Skidmore's § 1983 claims.[4]  Defendants' motion to dismiss those two claims is

2   GRANTED.

3   **III.    MOTION TO STRIKE**

4          Defendants separately move to strike Skidmore's California state law claim for false light

5   invasion of privacy.  Mot. at 19–23.  They argue that the false light claim arises from protected

6   activity—their own statements to the campus community about an issue of public concern—and

7   that Skidmore cannot demonstrate a probability of prevailing on her claim because Defendants

8   have multiple defenses to that claim.  *Id.*  In opposition, Skidmore defends the sufficiency of her

9   pleading and responds to each of Defendants' proffered defenses.  Opp. at 17–19.  The Court

10  agrees with Defendants that the claim must be stricken.

11         **A.    Legal Standard**

12         "Under California's anti-SLAPP statute, a defendant may bring a special motion to strike a

13  cause of action arising from constitutionally protected speech or petitioning activity."  *Barry v.*

14  *State Bar of California*, 2 Cal. 5th 318, 320 (2017).  "Unless the plaintiff establishes a probability

15  of prevailing on the claim, the court must grant the motion and ordinarily must also award the

16  defendant its attorney's fees and costs."  *Id.*

17         "The analysis of an anti-SLAPP motion proceeds in two steps."  *Barry*, 2 Cal. 5th at 321.

18  "At the first step, the moving defendant bears the burden of identifying all allegations of protected

19  activity, and the claims for relief supported by them."  *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016).

20  "When relief is sought based on allegations of both protected and unprotected activity, the

21  _____

22  [4] Because the Court finds Defendants are entitled to qualified immunity on the federal claims, it

23  need not reach the issue of whether "de facto discipline" in the form of shunning and alleged

24  damage to future job prospects deprives Skidmore of a cognizable property interest.  *See Paul v.*

25  *Davis*, 424 U.S. 693, 701 (1976) (finding that reputation alone, apart from some more tangible

26  interest such as employment, is not by itself sufficient to invoke protection of the Due Process

27  Clause); *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 374 (9th Cir. 1999) (allegations of damage to

28  future employment prospects not sufficient under *Paul*).

United States District Court
Northern District of California

1    unprotected activity is disregarded at this stage." *Id.* Only "[i]f the court determines that relief is

2    sought based on allegations arising from activity protected by the statute" is the second step

3    reached. *Id.*

4           At step two, "the burden shifts to the plaintiff to demonstrate that each challenged claim

5    based on protected activity is legally sufficient and factually substantiated." *Baral*, 1 Cal. 5th at

6    396.  Where the anti-SLAPP motion challenges only the legal sufficiency of the claims, the district

7    court applies the Rule 12(b)(6) standard to consider whether a claim is stated.  *See Planned*

8    *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018),

9    *amended*, 897 F.3d 1224 (9th Cir. 2018).  If the challenged claims are not adequately stated in the

10   initial pleading, the district court may defer consideration of the anti-SLAPP motion pending the

11   filing of an amended pleading.  *See Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d

12   1081, 1091-92 (9th Cir. 2004) (holding that district court did not err in deferring consideration of

13   Covad's anti-SLAPP motion pending receipt of Verizon's first amended complaint, and affirming

14   denial of anti-SLAPP motion to strike first amended complaint).  "[W]hen an anti-SLAPP motion

15   to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure

16   56 standard will apply." *Planned Parenthood*, 890 F.3d at 834.  Under that standard, "[t]he court,

17   without resolving evidentiary conflicts, must determine whether the plaintiff's showing, if

18   accepted by the trier of fact, would be sufficient to sustain a favorable judgment." *Baral*, 1 Cal.

19   5th at 396. "[I]n such a case, discovery must be allowed, with opportunities to supplement

20   evidence based on the factual challenges, before any decision is made by the court." *Planned*

21   *Parenthood*, 890 F.3d at 834.

22          **B.    Discussion**

23          Defendants do not specify whether they mount a facial attack on Skidmore's pleading—

24   necessitating a review under Rule 12(b)(6)—or a factual attack on Skidmore's alleged failure of

25   proof—requiring a review under Rule 56.  *See Planned Parenthood*, 890 F.3d at 834.  On the one

26   hand, several of Defendants' anti-SLAPP arguments refer back to arguments made in their Rule

27   12(b)(6) motion to dismiss or otherwise concern the sufficiency of the allegations in the

28   complaint.  *See* Mot. at 20–21 (citing sections of the motion to dismiss regarding immunity under

Cal. Gov't Code § 822.2, Cal. Civ. Code § 47(c), and the academic freedom doctrine and arguing that the faculty statements as alleged could not support a false light claim).  Other parts of their anti-SLAPP motion, however, cite to evidence discussed in and attached to declarations from the faculty Defendants and others.  *See id.* (citing declarations from defendants Fairbairn, Lu, Gilbert, and Rajan and nonparty Press).  Some case law suggests that where an anti-SLAPP motion "raises both legal and factual arguments," courts should evaluate the legal challenges first and decide whether the claims should be dismissed under Rule 12.  *Mandel v. Hafermann*, 503 F. Supp. 3d 946, 961 (N.D. Cal. 2020) (citing *Todd v. Lovecruft*, 2020 WL 60199, at *8 (N.D. Cal. Jan. 6, 2020)).  After such a dismissal, a plaintiff is given the opportunity to amend and conduct a discovery, and then the court would address the factual challenges.  *Id.* (citing *Todd*, 2020 WL 60199, at *8).

Here, the Court already deferred consideration of Defendants' initial anti-SLAPP motion and allowed Skidmore to amend, with the parties conducting discovery in the meantime (including depositions).  Skidmore has thus already had the benefit of the Court's guidance and discovery to put forth her best pleading, and another opportunity to amend may not be warranted.  Accordingly, the Court will analyze the anti-SLAPP motion first under the Rule 12(b)(6) standard and then discuss the motion to the extent it can be characterized as a factual challenge under the Rule 56 standard.

### i.    Protected Activity

"At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them."  *Baral*, 1 Cal. 5th at 396.  The Court previously found that the Defendants' three statements to the campus community condemning Skidmore's comments are allegations of protected activity under the anti-SLAPP statute.  *See Skidmore I*, 2021 WL 843195, at *2 (citing Cal. Code Civ. Proc. § 425.16(e)).  That remains true in the First Amended Complaint.  The three statements are undoubtedly speech made "in connection with a public issue or an issue of public interest."  Cal. Code Civ. Proc. § 425.16(e).  Skidmore does not contend otherwise.  Defendants have thus met their burden at step one.

1

### ii.   Probability of Prevailing

At step two, "the burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." *Baral*, 1 Cal. 5th at 396. The Court first evaluates this prong under the Rule 12(b)(6) standard before looking to the Rule 56 standard.

#### a.   *Facial Attack – Rule 12(b)(6) Standard*

When applying a Rule 12(b)(6) standard to evaluate an anti-SLAPP motion, the Court considers only the allegations in the complaint, documents incorporated into the complaint by reference, and matters that are subject to judicial notice. *See Planned Parenthood*, 890 F.3d at 834; *Iglesia Ni Cristo v. Cayabyab*, 2019 WL 3997474, at *3 (N.D. Cal. Aug. 23, 2019) (citing *Louisiana Mun. Police Emps. Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016)). Accordingly, the Court will not consider any of the assertions in declarations submitted by Defendants, but will consider the three full faculty statements because the Court has found them incorporated by reference into the First Amended Complaint. *See supra* note 2.

False light "is a species of invasion of privacy, based on publicity that places a plaintiff before the public in a false light that would be highly offensive to a reasonable person, and where the defendant knew or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Mitchell v. Twin Galaxies, LLC*, 70 Cal. App. 5th 207, 218 (2021) (quoting *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1264 (2017)); *see also* CACI No. 1802 (jury instructions for false light claim). False light claims are subject to the same constitutional protects that apply to defamation claims. *Briscoe v. Reader's Digest Ass'n*, 4 Cal. 3d 529, 543 (1971), *overruled on other grounds*, *Gates v. Discovery Comm'ns, Inc.*, 34 Cal. 4th 679, 696 n.9 (2004).

Defendants offer several different arguments directed at the pleading sufficiency of the false light claim. *See* Mot. at 19–23. The Court need not evaluate all of them because it agrees with two of the arguments: (1) that the three faculty statements are statements of opinion that are not capable of being proven "false," and (2) that the statements are protected by the academic freedom doctrine.

United States District Court
Northern District of California

1    <u>Statements as Opinions</u>.  "Opinions are constitutionally protected and cannot form the

2    basis of a defamation-type claim."  *Daniel v. Wayans*, 8 Cal. App. 5th 367, 397 (2017).  "Whether

3    a statement constitutes a statement of fact or opinion is a question of law."  *Id.* (citing *Baker v. Los*

4    *Angeles Herald Examiner*, 42 Cal. 3d 254, 260 (1986)).  A court "place[s] itself in the position of

5    the hearer or reader, and determine[s] the sense or meaning of the statement according to its

6    natural and popular construction.  Based on the language used and the totality of the surrounding

7    circumstances, the court determines whether the average reader or hearer 'could have reasonably

8    understood the alleged defamatory statement to be one of fact.'"  *Id.* (quoting *Baker*, 42 Cal. 3d at

9    261).

10           The Court finds that Defendants' statements as set out in the First Amended Complaint and

11   in the documents incorporated by reference are protected opinions under the First Amendment.

12   The foundation of Skidmore's false light claim is that Defendants allegedly called her "racist,"

13   "xenophobic," and "hateful" in their statements.  *See, e.g.*, FAC ¶¶ 93 (faculty statements

14   "portrayed [Skidmore] in a false light as a racist, a xenophobe, and a holocaust promoter, when

15   she was not"); 95 (Defendants failed to "calibrate their response prior to releasing official

16   statements to the general public that called [Skidmore] 'xenophobic' and 'genocidal'").  But

17   multiple courts (including in California) have held that a term like "racist," while "exceptionally

18   negative, insulting, and highly charged"—is not actionable under defamation-type claims because

19   it is "a word that lacks precise meaning" and "can imply many different kinds of fact."  *See*

20   *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1248, 1261–62 (2010); *see also Standing Comm.*

21   *on Discipline v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995) (epithets against judge, including

22   accusing him of "anti-[S]emitism" and being "ignorant," "ill-tempered," and a "buffoon," were

23   protected opinions); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (term "racist" is not

24   actionable under Illinois defamation law "unless it implies the existence of undisclosed,

25   defamatory facts"); *Cummings v. City of New York*, 2020 WL 882335, at *20 (S.D.N.Y. Feb. 24,

26   2020) (description of teacher or teacher's lesson as "racist" were nonactionable statements of

27   opinion); *Garrard v. Charleston Cnty. Sch. Dist.*, 429 S.C. 170, 199–202 (S.C. Ct. App. 2019)

28   (calling someone a "racist douchebag" was not actionable under defamation law because it was

United States District Court
Northern District of California

1   "susceptible to varying viewpoints and interpretations" as "[o]ne person may view certain

2   behavior as disrespectful and offensive, but another person might view the same behavior as non-

3   controversial and socially acceptable").

4      The facts here are even less stark than in many of these cited cases—as alleged,

5   Defendants called Skidmore's Facebook post, rather than Skidmore herself, "racist" and

6   "xenophobic."  *See* FAC ¶ 26 & Gilbert Decl. Ex. 2 ("A member of our student community

7   recently posted an appalling, hateful, and violent *comment* on social media.  The *comment* was

8   disturbingly xenophobic and deeply hurtful . . . .") (emphases added); ¶ 31 & Lu Decl. Ex. 2 ("[I]t

9   is critically important to undertake a full and thorough investigation of this individual who posted

10   this virulently racist and hateful *message*.") (emphasis added).  But even if they did not so limit

11   their statements, their use of the terms "racist," "xenophobic," "hateful," and the like would be

12   protected opinions.  Those terms are not capable of "precise meaning" and are "susceptible to

13   varying viewpoints and interpretations."  An "average reader or hearer" of the Defendants'

14   statements to the community could not have understood them to be statements of fact.  *Daniel*, 8

15   Cal. App. 5th at 397.  Indeed, a reader of the Defendants' statements may have disagreed with the

16   professors that Skidmore's post was "racist," "xenophobic," or "hateful."  Defendants' statements

17   further quote parts of Skidmore's Facebook post, allowing for an "average reader" to decide

18   whether she found those parts of the statement objectionable in that way.  *See Yagman*, 55 F.3d at

19   1439 (statement of opinion based on "expressly stated facts . . . can be punished only if the stated

20   facts themselves are false").  As protected opinions, the statements are not actionable under a

21   false-light claim.

22      The cases Skidmore cites on this issue are inapposite.  This is not a case where Defendants

23   are "couching a statement as a question, or adding qualifying language" to attempt to mask a

24   factual statement as an opinion.  *See Melaleuca, Inc. v. Clark*, 66 Cal. App. 4th 1344, 1354–55

25   (1998) (scientist's comments about what testing results on defendant's products showed were

26   actionable notwithstanding disclaimer that "opinions explained herein are based on [his] scientific

27   research"); *Overstock.com v. Gradient Analytics, Inc.*, 151 Cal. App. 4th 688, 703–05 (2007)

28   (statements implying Overstock.com changed accounting methodology to boost revenue were not

United States District Court
Northern District of California

immune from defamation claim merely because they were "couched in terms of opinion").  Unlike the results of a science experiment, which are at least capable of being expressed as data or delineated observations, or changes in corporate accounting policies, which either occurred or didn't, the underlying character of a statement as "racist" is not capable of precise definition or description.

Because the three statements are expressions of opinion, Skidmore's allegations are insufficient to state a claim for false light invasion of privacy and she cannot show a probability of prevailing on the claim.

Academic Freedom Doctrine.  "[T]eaching and academic writing are at the core of official duties of teachers and professors.  Such teaching and writing are 'a special concern of the First Amendment.'"  *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)).  Accordingly, the First Amendment robustly protects acts of public expression by academics on matters of public concern.  "The desire to maintain a sedate academic environment . . . [does not] justify limitations on a teacher's freedom to express himself [or herself] on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms."  *Adamian v. Jacobsen*, 523 F.2d 929, 934 (9th Cir. 1975).  Accordingly, the Ninth Circuit has stated that it "doubt[s] that a college professor's expression on a matter of public concern, directed at the college community, could ever constitute unlawful harassment" justifying judicial intervention.  *Rodriguez*, 605 F.3d at 710.[5]

---

[5] To the extent that this argument is an affirmative defense, the Court may consider Defendants' affirmative defenses in evaluating whether Skidmore has a probability of prevailing on her false light claim.  *See UCP Int'l Co. Ltd. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 979–82 (N.D. Cal. 2019) (evaluating defendants' litigation privilege and *Noerr-Pennington* arguments at prong two on a facial challenge); *Phoenix Trading, Inc. v. Loops LLC*, 732 F.3d 936, 942 n.6 (9th Cir. 2013) (approving consideration of affirmative defenses in district court's ruling on motion to strike and citing California cases approving the same).  The Court can evaluate this argument

United States District Court
Northern District of California

1    Those principles are squarely implicated here.  Relying solely on Skidmore's own

2  allegations in the First Amended Complaint, Defendants released statements to the ENVS

3  university community on a "matter of public concern"—comments made by Skidmore that they

4  deemed inappropriate and inconsistent with their views and the principles of community at UCSC.

5  FAC ¶¶ 26, 31, 42; Gilbert Decl. Exs. 2–3; Lu Decl. Ex. 2.  While Skidmore may have found the

6  manner of their comments "unmeasured . . . and even distinctly unpleasant," that does not mean

7  that those comments were not protected speech or that Skidmore has the right to stifle comments

8  made in direct reaction to her post.  *Adamian*, 523 F.2d at 934.

9    Skidmore takes issue with the application of the academic freedom doctrine in this case,

10  but each of her arguments lacks merit.  She first takes issue with applying the doctrine because her

11  speech "was not made in the context of an academic conversation" and was made "outside of

12  school hours, unrelated to school activities, and to her private Facebook friends."  Opp. at 13.

13  This misapprehends the reach of the academic freedom doctrine, which protects comments made

14  by academics "on a matter of public concern, directed at the college community."  *Rodriguez*, 605

15  F.3d at 710.  The doctrine is not restricted to comments made on the topics the professors teach or

16  on matters raised in the context of school activities.  That restriction, of course, would restrict

17  academics to speaking out only on courses they taught or events transpiring on campus.

18  Professors' First Amendment rights are not so limited.

19    Second, Skidmore attempts to distinguish *Rodriguez*, but her comments highlight why that

20  case is quite similar to this one.  In *Rodriguez*, a university professor sent three "racially-charged"

21  emails to a distribution list maintained by the local community college district, where he taught

22  math.  605 F.3d at 705.  The emails questioned why the district celebrated "Dia de la raza," which

23  is an alternate celebration to Columbus Day.  *Id.*  The emails urged the district to "acknowledge

24  and celebrate the superiority of Western Civilization" and claimed that "Native Americans

25  actually committed genocide against the original white-skinned inhabitants of North America."

26  _____

27  strictly on the allegations in Skidmore's pleading and the incorporated full versions of the

28  statements without reference to extrinsic evidence.

*Id.* at 705–06.  Apparently in response to replies calling his messages "racist," the professor sent another email saying his opinions were "[r]ealistic," not racist, and claiming that "history has answered quite convincingly which cultures were backward."  *Id.* at 706.  Prominent members of the district, including the president of the community college, condemned the statements via the college email system but recognized that "the openness of our [email] system  . . . allows individuals to express opinions on almost any subject."  *Id.* at 707.  The university took no disciplinary action, prompting a group of the district's Hispanic employees to sue the district for failing to "properly respond to [the professor's] emails."  *Id.* at 705.

The Ninth Circuit rejected the class's claims, finding that the college was not obligated to discipline the professor and that the professor's comments were not unlawful harassment.  The Ninth Circuit recognized that the class "no doubt felt demeaned" by the professor's comments.  *Id.* at 708.  "But that," the Ninth Circuit said, "highlights the problem with plaintiffs' suit.  Their objection to [the professor's] speech is based entirely on his point of view."  *Id.*  Pointing to the "intense debate" sparked by the statements, the Ninth Circuit recognized that "[t]he Constitution embraces such a heated exchange of views, even (perhaps especially) when they concern sensitive topics like race, where risk of conflict and insult is high."  *Id.* at 708 (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391 (1992)).  The panel expressed "doubt that a college professor's expression on a matter of public concern, directed to the college community, could ever constitute unlawful harassment and justify the judicial intervention that plaintiffs seek."  *Id.* at 710.  The Ninth Circuit thus rejected the class's arguments that the district was obligated to prevent dissemination of the professor's messages, and that the class had not met its obligation to identify a constitutional violation such that qualified immunity was inappropriate.  *Id.* at 710–11.[6]

Skidmore attempts to make several factual distinctions between this case and *Rodriguez*, arguing that (1) the professor's statement was made on school email, whereas Skidmore's post was on her private Facebook account outside of school hours; (2) the Defendants' messages here

_____

[6] Although *Rodriguez* considered qualified immunity, there is no indication that its statements about the academic freedom doctrine are restricted to the qualified immunity context.

1    "had no academic purpose [and] did not seek to disseminate a message"; and (3) Skidmore is an

2    individual, not a member of a certified class.  Opp. at 14–15.  These arguments are not persuasive.

3    The statements Skidmore attacks—those made by the Defendant faculty members—were in fact

4    made via the school email system.  Defendants' statements no doubt sought "to disseminate a

5    message"—Skidmore's disagreement with that message is the whole basis for this lawsuit.  And

6    finally, there is no basis in *Rodriguez* for suggesting that Skidmore's status as an individual

7    plaintiff makes the case inapposite.  *Rodriguez* is accordingly analogous to this case.

8            Finally, Skidmore argues that Defendants are trying to use the academic freedom doctrine

9    as a weapon to "silence[] Skidmore's right to free speech."  Opp. at 14.  Not so.  Skidmore had a

10   right to say what she said, no matter how distasteful others found her statements.  But it is she

11   who, through this lawsuit, is trying to simultaneously use the First Amendment as a shield (to

12   protect her own statements) and a sword (to silence the First Amendment rights of professors to

13   respond).  The academic freedom doctrine protects the professors' right to comment on

14   Skidmore's Facebook post, just as the First Amendment protects Skidmore's right to make her

15   Facebook post in the first place.  Skidmore's false light claim is thus barred.

16                        *b.   Factual Attack – Rule 56 Standard*

17           Because the Court has found legal deficiencies in Skidmore's claims, it ordinarily need not

18   proceed to consider any factual challenges Defendants make in their anti-SLAPP motion.  *Mandel*,

19   503 F. Supp. 3d at 961 (citing *Todd*, 2020 WL 60199, at *8).  Nevertheless, because some of

20   Defendants' arguments cite declarations and evidence offered by the individual faculty defendants,

21   the Court discusses the Rule 56 analysis and explains why Skidmore cannot show a probability of

22   prevailing.

23           Applying the Rule 56 standard, Skidmore has the burden to "present competent, admissible

24   facts in opposing the anti-SLAPP motion" to show that the complaint "is both 'legally sufficient

25   and supported by a sufficient prima facie showing of *facts* to sustain a favorable judgment.'"

26   *Steed v. Dep't of Consumer Affairs*, 204 Cal. App. 4th 112, 124 (2012) (quoting *Navellier v.

27   Sletten*, 29 Cal. 4th 82, 89 (2002)).  A plaintiff must have the opportunity to conduct discovery

28   before dismissal on the basis of a factual anti-SLAPP challenge in federal court.  *Planned*

United States District Court
Northern District of California

23

*Parenthood*, 890 F.3d at 834–35.

As Defendants argue, Skidmore has not met her burden of producing her own "prima facie showing of facts" that demonstrate a probability of prevailing. *See Steed*, 204 Cal. App. at 124; *see also Baral*, 1 Cal. 5th at 385 ("[C]laims with the requisite minimal merit may proceed."). In opposition, to be sure, Skidmore addresses each of Defendants' defenses to her false light claim. But that alone cannot carry her burden. In response to a factual anti-SLAPP challenge, Skidmore must herself present *affirmative evidence* to make a prima facie showing that there is "minimal merit" to her claim and that she has some probability of prevailing. *Baral*, 1 Cal. 5th at 385. Skidmore does not point to any affirmative evidence in her brief. Skidmore did not submit a declaration with her opposition brief backing up the allegations in her complaint or rebutting the testimony offered in Defendants' declarations. Her counsel has offered a declaration attaching emails between university officials and faculty members and the statements at issue, but Skidmore has not offered any argument in opposition to the anti-SLAPP motion about what those emails show or how they establish that her claim has minimal merit. Without argument about which elements of her false light claim those emails support, Skidmore has not explained how her complaint is "supported by a sufficient prima showing" of evidence. *Steed*, 204 Cal. App. 4th at 124. The Court will not fill in the gaps for her.

Before dismissing pursuant to a factual anti-SLAPP challenge in federal court, a plaintiff must have been given an opportunity to conduct discovery. *Planned Parenthood*, 890 F.3d at 834–35. Skidmore has already been given that opportunity here. The Court deferred resolution of Defendants' first anti-SLAPP motion and gave Skidmore the benefit of its guidance on her original complaint. *See* ECF No. 55. Skidmore amended and conducted discovery, including depositions of the named Defendants. *See* ECF No. 74 at 2 (discussing Skidmore's depositions of Defendants and certain "percipient witnesses"). She has now offered a proposed Second Amended Complaint that she argues adds additional support for her claims. The Court considers those amendments below and finds that they would be futile. *See infra* Section IV. Skidmore does not claim that she needs any additional discovery to show a probability of prevailing. The Court thus need not give Skidmore further opportunity to conduct discovery before deciding the

1   anti-SLAPP motion, even if the motion is characterized as a factual challenge.

2          Accordingly, to the extent Defendants mount a factual challenge under the anti-SLAPP

3   statute, Skidmore has not met her burden to produce affirmative evidence supporting her claim,

4   and the false light claim must be stricken.

5                                            *       *       *

6          Because Skidmore has not met her burden at step two of the anti-SLAPP analysis, the

7   Court GRANTS Defendants' motion to strike Skidmore's false light claim.

8   **IV.     MOTION FOR LEAVE TO AMEND**

9          Because the Court has dismissed and stricken Skidmore's claims, it must also consider

10  whether she should be given leave to amend.  Unlike the typical situation in which it is presented

11  with a motion to dismiss or strike, the Court here has a proposed Second Amended Complaint that

12  Skidmore says contains additional allegations supporting her claims.  *See* SAC.  The Court

13  considers whether to grant leave to amend based on the proposed Second Amended Complaint.

14         **A.     Legal Standard**

15         Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading once as a

16  matter of course within 21 days of serving it.  Fed. R. Civ. P. 15(a)(1).  Further amendment of the

17  pleadings is allowed with the opposing party's consent or leave of the court.  *Id.* R. 15(a)(2).  The

18  factors considered when determining whether to grant leave to amend include: "(1) bad faith on

19  the part of the movant; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the

20  proposed amendment."  *Ciampi v. City of Palo Alto*, 2010 WL 5174013, at *2 (N.D. Cal. Dec. 15,

21  2010) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)).  However, "[o]nce the district court

22  ha[s] filed a pretrial scheduling order pursuant to Federal Rule of Civil Procedure 16 which

23  established a timetable for amending pleadings[,] that rule's standards control[]."  *Johnson v.*

24  *Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).  A party seeking to amend a

25  scheduling order must show "good cause" for such relief.  Fed. R. Civ. P. 16(b)(4) ("A schedule

26  may be modified only for good cause and with the judge's consent.").  If the moving party

27  establishes "good cause" to modify the scheduling order, "it must then demonstrate that its motion

28  is also proper under Rule 15."  *Rodarte v. Alameda Cty.*, 2015 WL 5440788, at *2 (N.D. Cal. Sept.

United States District Court
Northern District of California

15, 2015) (citing *Johnson,* 975 F.2d at 608).

The "good cause" analysis "is not coextensive with an inquiry into the propriety of the amendment under [] Rule 15." *Johnson*, 975 F.2d at 609. "Unlike Rule 15(a)'s liberal amendment policy . . . Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Id.* Courts may take into account any resulting prejudice to the opposing party, but "the focus of the [Rule 16(b)] inquiry is upon the moving party's reasons for seeking modification ... [i]f that party was not diligent, the inquiry should end." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013), *aff'd sub nom. Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015) (quoting *Johnson,* 975 F.2d at 609).

### B.   Discussion

#### i.   Rule 16:  Good Cause

The Court's scheduling order set a March 15, 2021 deadline for requesting leave to amend the pleadings under Rule 15. *See* ECF No. 41 at 2. Skidmore filed her *ex parte* request to provide further briefing on November 23, 2021, which led the Court to request a motion for leave to amend. ECF Nos. 69, 71. Even construing her *ex parte* request as a request to amend, the request came over eight months after the deadline set in the scheduling order. Skidmore accordingly must meet Rule 16's good cause standard to justify amendment.

The Court has serious doubts that Skidmore meets that standard. As an initial matter, Skidmore's motion for leave to amend does not even address Rule 16, instead skipping to the Rule 15 analysis. In reply, Skidmore says that she meets the good cause standard because "through discovery [she] has uncovered facts through which the Court could draw a reasonable inference" that Defendants acted "in retaliation to Skidmore's private Facebook post." *See* ECF No. 80 at 2–3. That discovery would allow Skidmore to expand her pleadings is not usually justification for filing an amended complaint, especially at this stage of the case. Skidmore and her counsel were obligated to investigate and adequately plead their case before discovery. Even if discovery could justify amendment, Defendants have cast doubt on that justification with their claim that no discovery was requested until November 2021 when the first deposition occurred. 12/9/21 Hrg. Tr. at 9:7–18. This alone suggests that Skidmore is dilatory in seeking amendment. *Johnson*, 975

F.2d at 609 (delay in seeking amendment is main aim of Rule 16 inquiry).

The Court believes that Skidmore has not met the good cause standard, which is required before proceeding to the Rule 15 analysis.  *Rodarte*, 2015 WL 5440788, at *2.

### ii.   **Rule 15:  *Foman* Factors**

Although Skidmore has not met the good cause standard, the Court will nevertheless analyze the *Foman* factors because they also counsel against allowing the proposed amendments. Again, those factors are "(1) bad faith on the part of the movant; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment."  *Ciampi*, 2010 WL 5174013, at *2 (citing *Foman*, 371 U.S. at 182).  While Defendants present argument on factors two, three, and four, the Court will focus on the fourth factor and analyze the additional allegations that Skidmore says support her claims.  Those allegations fit into two[7] categories.

Additional Retaliatory Motive and De Facto Punishment Allegations.  Skidmore says that she uncovered additional facts through depositions that support the argument that the Defendants were acting with retaliatory motive against her.  *See* MLTA at 4 (citing SAC ¶¶ 25–30, 38, 40–42, 82).  Those allegations relate to a Zoom meeting between Defendants and other faculty members soon after Skidmore's post, in which it was allegedly made clear that Skidmore's post was protected First Amendment speech.  SAC ¶¶ 25, 27, 28, 29.  The faculty allegedly discussed imposing "tacit punishment" on Skidmore even though they believed they could not actually punish her.  *Id.*  Other paragraphs discuss emails between faculty non-defendants stating that "alienation from colleagues and other members of the department" would be an "appropriate disciplinary measure given that [they couldn't] provide a formal one."  *Id.* ¶ 26.  Other paragraphs discuss Defendants fearing for their safety or telling Skidmore that her remarks were "upsetting . . . [a]s a Jew who's [*sic*] – half of – a third of our population was killed in genocidal activity not that long ago."  *Id.* ¶¶ 40–42.

---

[7] At the time of her motion for leave to amend, Skidmore sought to add Dr. Teresa Marie Linda Scholz as a defendant.  She has since withdrawn that request.  ECF No. 82; *see also* 12/9/21 Hrg. Tr. at 28:15–25.

United States District Court
Northern District of California

The additional allegations do not undermine the Court's qualified immunity or anti-SLAPP analyses and largely mirror what was already alleged in the First Amended Complaint.  The allegations still characterize the "tacit punishment" as the shunning that resulted Defendants' three statements in response to Skidmore's Facebook post.  And the deposition quotes are consistent what has already been pled about the faculty members' awareness that Skidmore's post was likely protected under the First Amendment.  *See* FAC ¶ 25 (Defendants allegedly continued to advocate for disciplining Skidmore even after investigator preliminarily told them that Skidmore's post was protected).   Neither do these amendments counsel against finding the statements are protected opinions or applying the academic freedom doctrine; as stated in *Rodriguez*, it is doubtful that "a college professor's expression on a matter of public concern, directed at the college community, could ever constitute unlawful harassment."  605 F.3d at 707–09.  Because these new paragraphs are not of any help to Skidmore in identifying a violation of a "clearly established" right or in taking the statements outside of the academic freedom doctrine, amendment to include them in a new complaint would be futile.

Additional Continuing Harm Allegations.  Skidmore also offers new allegations about receiving her degree and attempting to find a job.  MLTA at 5 (citing SAC ¶¶ 77–82).  Those paragraphs allege that Skidmore received her Ph.D. in June 2021.  SAC ¶¶ 77–78.  Although she has graduated, Skidmore has applied for at least sixteen academic positions but "has not heard back from any." *Id.* ¶¶ 78–79.  Skidmore attributes this to the three statements published by Defendants and the presence of the NextShark article in online search results about her.  *Id.* ¶¶ 80–82.

These allegations similarly do not help Skidmore.  The first new allegation—that she received her Ph.D. on schedule in June 2021—actually undermines her case by confirming that no concrete discipline in the form of delayed graduation was ever imposed.  *Contra* FAC ¶ 63 (alleging that the three statements evidenced a goal of "push[ing] for expulsion," "making completing her Ph.D. difficult," and "changing the requirements of her Ph.D.").  The allegations about her job search do not alter the qualified immunity or anti-SLAPP analyses.  She still alleges that the three statements—which the Court has already found Defendants are entitled to qualified

United States District Court
Northern District of California

immunity, are protected opinions, or are encompassed in the academic freedom doctrine—are what has caused her to be unable to find a job.  Skidmore has not alleged any additional actions of Defendants—such as negative references, interference with her applications, or other affirmative acts—that would prompt expanded qualified immunity or anti-SLAPP analyses.

Because none of Skidmore's proposed amendments to her complaint cure the deficiencies in her claims, amendment would be futile.  The motion for leave to amend is accordingly DENIED.

## V.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND and Skidmore's motion for leave to amend is DENIED.  Judgment will issue.

If Defendants elect to pursue attorneys' fees incurred in moving to strike Skidmore's state law claim, they SHALL file that motion **no later than 28 days from the date of this Order**. Skidmore may file an opposition to that motion **no later than 14 days after the motion filed**, and Defendants may file a reply **no later than 7 days after Skidmore files her opposition**.  These deadlines may be modified by stipulation of the parties.  At the conclusion of briefing, the Court will take the motion under submission without oral argument.  *See* Civil L.R. 7-1(b).  The materials SHALL comply with this Court's standing orders regarding motions for attorneys' fees. *See* Standing Order re Civil Cases §§ IV.A.4, VII.  The briefs are limited to 5 pages for the motion and opposition and 3 pages for the reply.

Dated:  February 15, 2022

BETH LABSON FREEMAN
United States District Judge